Filed 12/13/23  P. v. Plascencia CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C097265 |
| Plaintiff and Respondent, | (Super. Ct. No. 21FE020019) |
| v. | |
| ROBERT PLASCENCIA, | |
| Defendant and Appellant. | |

One November morning, a masked individual fired several shots at a dark sedan near the intersection of Del Paso Boulevard and Plaza Avenue in Sacramento.  A jury found defendant Robert Plascencia guilty of discharging a firearm at an occupied motor vehicle, discharging a firearm in a grossly negligent manner, and being a felon in possession of a firearm.

On appeal, defendant asserts (1) the trial court abused its discretion by admitting into evidence a photograph from an Instagram account without proper authentication,

1

and, if he forfeited this contention, he was denied the effective assistance of counsel, (2) insufficient evidence supported his convictions because there was not substantial evidence the shooter possessed and discharged a "firearm," and (3) the conviction of discharging a firearm in a grossly negligent manner must be reversed as a lesser included offense of discharging a firearm at an occupied motor vehicle. The People concede the third point, and further assert the matter must be remanded for resentencing so the trial court can either strike a prior serious felony conviction enhancement or impose a five-year term on that enhancement.

We will reverse the discharging a firearm in a grossly negligent manner conviction, vacate the sentence imposed on that count, and remand for the trial court to strike the prior serious felony conviction enhancement or impose the enhancement's five-year term.

## FACTS AND HISTORY OF THE PROCEEDINGS

In an amended information, the prosecution charged defendant with discharging a firearm at an occupied motor vehicle (Pen. Code, § 246; count one; statutory section citations that follow are found in the Penal Code unless otherwise stated), discharging a firearm in a grossly negligent manner (§ 246.3; count two), and being a felon in possession of a firearm (§ 29800, subd. (a)(1); count three). The information further alleged defendant had sustained a prior serious felony conviction (§ 667, subd. (a)) and a prior strike (§§ 667, subds. (b)-(i), 1170.12).

The Prosecution Case

On the morning of November 10, 2021, someone called 911 to report a shooting in the area of Del Paso Boulevard and Plaza Avenue in Sacramento. The caller described the shooter as a male wearing a balaclava mask, a red hoodie with an emblem on the front, and light colored pants.

2

Around the same time, Officer Robert Mueller responded to a ShotSpotter notification, a system that detects gunfire in areas of Sacramento, indicating five gunshots were detected in the area of 2421 Del Paso Boulevard near an auto parts store and a donut shop. Mueller spoke to witnesses and looked for surveillance recordings. He found two surveillance videos taken in the vicinity, both of which were played for the jury. The two surveillance videos were on a DVD admitted as People's exhibit 2. We have independently reviewed the recordings.

The first video on People's exhibit 2, "Plascencia surveillance one," showed a parking lot and the intersection of Plaza Avenue and Del Paso Boulevard. Four individuals can be seen at a distance standing near a parked car. A dark sedan drives by on Del Paso Boulevard. This sedan captures the attention of one of the four individuals. He watches the sedan go by and then turn right. The individual walks, and then runs, through the parking lot in the direction the sedan has traveled. This individual is wearing a dark-colored ski mask obscuring all of his face except for his eyes and the bridge of his nose, a red hoodie with a San Francisco 49ers "SF" logo in the middle of a shield design, light-colored jeans with narrow red and white piping or striping down the sides, and dark shoes. Hands in his pockets, he runs out of the frame. Seconds later, the individual's companions and other bystanders can be seen looking in the direction the individual ran.

The second video on People's exhibit 2, "Plascencia surveillance two," depicted Plaza Avenue looking to the west from the back of the donut shop. As the video begins, a dark sedan consistent with the sedan in "Plascencia surveillance one" can be seen in the distance slowing at a stop sign and beginning to turn left. As the sedan turns left and proceeds, in the lower left corner of the frame, an individual with a dark ski mask, a red hoodie, light-colored jeans with narrow red and white piping or striping down the sides, and dark shoes can be seen entering the frame. The individual is holding what appears to be a handgun in both hands, pointing it in the direction of the sedan. The individual begins to fire the gun, as is evidenced both by the appearance of smoke coming out of the

barrel and the clear sound of shots being fired.  He fires shots while holding the gun with both hands and then begins to run back in the other direction, from the grass next to the sidewalk into the street, continuing to fire the gun with just his right hand.  Five discrete shots can be heard on the audio.  As the last of the shots can be heard, the individual moves out of the lower left side of the frame.  The dark sedan continues driving away.

People's exhibit 3 consisted of 18 still photographs captured from "Plascencia surveillance one."  Exhibits 15 through 18 were stills from the surveillance video that had been blown up.

Officer Mueller searched the area of the shooting and found two .380-caliber cartridge casings.  He did not discover any damage to vehicles or buildings in the area. No one ever called 911 to report being a victim of this shooting.

Officer Lorenzo Vidales testified that he went to talk with Marissa R. who had a relationship with defendant, after defendant became a suspect in the shooting.  Vidales's body-worn camera recorded the interaction, and the video was played for the jury.

On the recording, People's exhibit 4, ("Plascencia [Marissa R.] Statement") Marissa R. tells officers that defendant's mother worked at a laundromat near the location depicted in one photograph, which was the parking lot in front of the donut shop on Plaza Avenue and Del Paso Boulevard.  Marissa R. stated the individual pictured in another photograph looked like defendant.  When Vidales asked how she could tell it was defendant with his face covered, Marissa R. said, "That looks like [defendant], because I kind of- I know his eyes.  I'm really familiar with his eyes, and that sweater is really familiar, as well as those pants, and the last time I saw him he was wearing these," indicating the subject's shoes.  Striping or piping down the side of the pants could not be seen in the photograph Vidales showed Marissa R.  However, when Vidales said the pants had red or black stripes going down both sides, Marissa R. responded that the pants had a red stripe and a skinny white stripe down each side.  She said she had seen

defendant in the same sweatshirt.  She said, "yeah that definitely looks like [defendant].  I know him from top to bottom."

At trial, Marissa R., who shared a son with defendant and had known him for many years, testified under subpoena.  She did not want to testify.  According to Marissa R., when a police officer contacted her, he lied to her, telling her he wanted to talk to her about her child.  However, when he came to her house, he showed her two photographs, People's exhibits 15 and 16, stills from "Plascencia surveillance one."  Marissa R. testified at trial she did not recall whether she told the officer that she knew the person in the photograph.  She testified she did not recognize the person's features or clothing.  Regarding what she may have told police earlier, she testified she felt "like there was a way that they were trying to tell me it was him," that they were trying to suggest to her what to say.

As we will discuss in further detail in part I, section A. of the Discussion, *post*, the prosecutor asked to publish People's exhibit 5, a photograph taken from an Instagram account, and the court granted permission.  According to Officer Vidales, the photograph shows defendant wearing the same shirt and similar pants and shoes as the shooter.  The post was dated less than a month and a half before the shooting.

When police arrested defendant, Officer Kyle Stackhouse found a black ski mask in defendant's pocket.  Stackhouse testified this mask appeared to be similar to the mask worn by the shooter.

Police discovered two addresses associated with defendant, apartments on Darina Avenue where he stayed.  People's exhibit 7, an overhead map, showed the area, including the location of the Darina Avenue addresses and, a few blocks away, the location of the shooting.  In a search of the two apartments, officers found another ski mask, although it did not appear to be the mask worn by the shooter.  Officers did not locate a firearm, bullets, a red sweatshirt with a 49ers "SF" logo, or light-colored jeans with a red stripe on the side.

5

Officer Ruvim Tsverov testified about another occasion, in September 2021, when he contacted defendant in the parking lot near Del Paso Boulevard and Plaza Avenue near the donut shop and laundromat.

Verdict and Sentencing

The jury found defendant guilty on all counts. In a bifurcated proceeding, the trial court found true the prior serious felony conviction allegations.

The trial court denied defendant's motion to strike his prior strike conviction. (See *People v. Superior Court (Romero)* (1996) 13 Cal.4th 497.) The court sentenced defendant to the low term of three years on count one, doubled to six years for the prior strike conviction, the low term of 16 months on count two doubled to two years eight months with that sentence stayed pursuant to section 654, and a concurrent low term of 16 months on count three doubled to two years eight months.

DISCUSSION

I

*Admission of Instagram Photograph*

A. Additional Background

Prior to publishing People's exhibit 5, the Instagram photograph, Officer Vidales testified he found an Instagram profile he believed to be defendant's. Defense counsel objected based on lack of foundation and the court overruled the objection. Vidales testified he reviewed photographs posted on that account and believed they depicted defendant. The prosecutor showed Vidales People's exhibit 5 and Vidales testified it was a photograph of defendant from the Instagram account. Defense counsel objected "as to lack of foundation as to being his account," which the trial court sustained, instructing the prosecutor to lay a foundation. The court then asked, "how do you know it's his account," a question the prosecutor posed to Vidales. Vidales responded, "[b]ecause of

6

various photos of him on the account. Also, in my training and experience, knowing that Instagram accounts of people, primarily are the posts – post photos of themselves." Vidales testified the account had various photos of just defendant. The prosecutor asked if there were captions "with words made kind of in first person," and, after the trial court overruled defense counsel's hearsay objection, Vidales responded that there were.

On cross-examination, Vidales acknowledged he never asked defendant if the Instagram account was his or otherwise sought to confirm it was defendant's account. He acknowledged he was speculating that it was defendant's account. He also acknowledged it is not uncommon for people to post photographs of others on their Instagram accounts. Thus, Vidales acknowledged it could be someone else's Instagram account with a photograph of defendant.

Defense counsel did not object to publication or admission of People's exhibit 5.

### B.  Defendant's Contentions

Defendant asserts the trial court erred in admitting the Instagram photograph because it was not properly authenticated. He asserts there was no evidence to connect defendant to the Instagram account. The People respond that defendant forfeited his contention because trial counsel's objections to the foundation of the Instagram account did not preserve defendant's challenge to the authentication of the specific photograph, People's exhibit 5.

### C.  Forfeiture

Defense counsel objected to testimony about what Vidales concluded to be defendant's Instagram account based on lack of foundation, to lack of foundation for the conclusion that the account was defendant's, and to captions based on hearsay. Defense counsel did not object to publication or admission of People's exhibit 5, based on lack of authentication or otherwise.

7

"A verdict or finding shall not be set aside, nor shall the judgment or decision based thereon be reversed, by reason of the erroneous admission of evidence unless:  [¶] (a) [t]here appears of record an objection to or a motion to exclude or to strike the evidence that was timely made and so stated as to make clear the specific ground of the objection or motion . . . ."  (Evid. Code, § 353, subd. (a).)  "The requirement that an objection to evidence be timely made is important because it 'allows the court to remedy the situation before any prejudice accrues.' "  (*People v. Boyette* (2002) 29 Cal.4th 381, 424.)  A " ' "defendant's failure to make a timely and specific objection" on the ground asserted on appeal makes that ground not cognizable.' "  (*People v. Partida* (2005) 37 Cal.4th 428, 434.)  Having failed to raise a timely and specific objection to the photograph based on lack of authentication, defendant has forfeited his contention.

D.  Ineffective Assistance of Counsel

Defendant asserts that, if he forfeited his contention, he received the ineffective assistance of counsel at trial.

To prevail on a claim of ineffective assistance of counsel, a defendant must show (1) counsel's performance fell below an objective standard of reasonableness under prevailing professional norms, and (2) the deficient performance prejudiced defendant. (*Strickland v. Washington* (1984) 466 U.S. 668, 691-692 (*Strickland*); *People v. Ledesma* (1987) 43 Cal.3d 171, 216-217 (*Ledesma*).)  "[T]here is no reason for a court deciding an ineffective assistance claim to approach the inquiry in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing on one. In particular, a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. . . .  If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . , that course should be followed." (*Strickland*, at p. 697.)

8

We thus turn directly to prejudice. To establish prejudice, defendant must show a reasonable probability that he would have received a more favorable result had counsel's performance not been deficient. (*Strickland, supra*, 466 U.S. at pp. 693-694; *Ledesma, supra*, 43 Cal.3d at pp. 217-218.) We conclude that, even if counsel should have objected to the Instagram photograph for lack of authentication, counsel's failure did not prejudice defendant.

The relevance of the Instagram photograph was specific and limited. It showed defendant dressed in what appears to be the same sweatshirt the shooter is wearing in the surveillance video and still photographs derived from that video. He is also wearing pants and shoes similar to those worn by the shooter. Particularly with reference to the sweatshirt, this photograph was relevant because it had some tendency in reason to prove defendant was, in fact, the shooter. (Evid. Code, § 210 [relevant evidence is evidence "having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action"].) However, in addition to other evidence tending to prove defendant was the shooter, there was also other evidence that defendant had the same sweatshirt as the one worn by the shooter.

Marissa R. had a relationship with defendant, shared a son with him, and had known him for many years. She was familiar with the location of the shooting and told Officer Vidales that defendant's mother worked nearby. She stated the individual pictured in a photograph taken from the surveillance video looked like defendant. When Vidales asked how she could tell it was defendant with his face covered, Marissa R. said, "That looks like [defendant], because . . . I know his eyes. I'm really familiar with his eyes, and that sweater is really familiar, as well as those pants, and the last time I saw him he was wearing these," indicating the person's shoes. She said she had seen defendant in the same sweatshirt. Striping or piping down the side of the pants could not be seen in the photograph, but, when Vidales said to Marissa R. the pants had red or black stripes, Marissa R. responded that they had a red stripe and a skinny white stripe

9

down each side. In both surveillance videos, red and white piping or striping can be seen running down the sides of the shooter's pants. Referring to the photograph, Marissa R. told Vidales, "yeah that definitely looks like [defendant]. I know him from top to bottom."

Marissa R.'s trial testimony was markedly different. She acknowledged she did not want to testify, said that police lied to her, testified she did not recall whether she told police she knew the person in the photograph, testified she did not recognize the person's features or clothing, and testified police suggested the answers they were looking for. However, it appears the trier of fact resolved these conflicts by crediting Marissa R.'s statements to Vidales. Notably, Marissa R.'s statements to Vidales were video recorded, and jurors watched the recorded interview for themselves, weighing Marissa R.'s prior statements against her contrary trial testimony.

Moreover, when police arrested defendant, Officer Stackhouse found a black ski mask in defendant's pocket which appeared to be similar to the mask worn by the shooter. Additionally, Officer Tsverov testified about an occasion in September 2021 when he encountered defendant in the parking lot at Del Paso Boulevard and Plaza Avenue near the donut shop and laundromat, indicating he spent time in the area, which was blocks from the apartments where he stayed.

We conclude that, even if counsel performed deficiently for failing to object to the admission of the Instagram photograph based on lack of authentication, it is not reasonably probable defendant would have received a more favorable result had counsel raised that objection. (See *Strickland, supra*, 466 U.S. at pp. 693-694; *Ledesma, supra*, 43 Cal.3d at pp. 217-218.) Because defendant cannot establish prejudice, his ineffective assistance of counsel claim fails.

We briefly note that, even if defendant's claim was not forfeited, the result would be the same. The *Watson* standard for harmless error (*People v. Watson* (1956) 46 Cal.2d 818, 836), which defendant agrees would apply to any state law error in admitting the

10

photograph, is substantially the same as the prejudice prong of *Strickland*. (*People v. Ocegueda* (2016) 247 Cal.App.4th 1393, 1407, fn. 4.) Even if we concluded defendant did not forfeit his contention, and even if we concluded the trial court abused its discretion in admitting the photograph, under *Watson*, we would conclude defendant was not prejudiced as a result.

## II

### *Substantial Evidence*

Defendant asserts insufficient evidence supports his convictions. Each count involved either possession or discharge of a firearm, and, according to defendant, there was not substantial evidence the weapon used qualified as a firearm. We are not persuaded.

"In reviewing a claim for sufficiency of the evidence, we must determine whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime . . . beyond a reasonable doubt. We review the entire record in the light most favorable to the judgment below to determine whether it discloses sufficient evidence—that is, evidence that is reasonable, credible, and of solid value—supporting the decision, and not whether the evidence proves guilt beyond a reasonable doubt. [Citation.] We neither reweigh the evidence nor reevaluate the credibility of witnesses. [Citation.] We presume in support of the judgment the existence of every fact the jury reasonably could deduce from the evidence. [Citation.] If the circumstances reasonably justify the findings made by the trier of fact, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding." (*People v. Jennings* (2010) 50 Cal.4th 616, 638-639.)

The Penal Code defines a firearm as "a device, designed to be used as a weapon, from which is expelled through a barrel, a projectile by the force of an explosion or other

form of combustion." (§ 16520, subd. (a).) The trial court instructed the jury with this language. (CALCRIM No. 965.)

As another panel of this court observed, firearms involved in crimes are often not recovered and circumstantial evidence alone is sufficient to prove the object used was a firearm. (*People v. Monjaras* (2008) 164 Cal.App.4th 1432, 1436.) In the context of robbery, that court stated, "when as here a defendant commits a robbery by displaying an object that looks like a gun, the object's appearance and the defendant's conduct and words in using it may constitute sufficient circumstantial evidence to support a finding that it was a firearm . . . ." (*Id.* at p. 1437.)

Two sources initiated police involvement in the shooting here. An individual called 911 to report "a shooting." The other source was a notification from ShotSpotter, a system that detects "gunfire." In one of the surveillance videos on People's exhibit 2, "Plascencia surveillance two," the shooter can be seen firing what looks like a firearm five times, accompanied by the loud sounds of the shots fired. Officer Mueller searched the area of the shooting and found two .380-caliber cartridge casings.

We conclude the foregoing constitutes substantial evidence supporting the jury's determination that defendant had in his possession and fired a firearm at the dark sedan, rather than, for example, a BB gun or pellet gun. (See *People v. Monjaras*, *supra*, 164 Cal.App.4th at p. 1435 [discussing why pellet guns and BB guns do not qualify as "firearms"].) Defendant fired five shots, and police only found two cartridge casings. However, defendant fired at least some of the shots while he was running in the street. This was the street the dark sedan had just driven on and which was obviously open to vehicular traffic, potentially displacing other cartridge casings, even though police arrived shortly after the shooting. We cannot agree with defendant's characterization that it was "nonsensical that if the weapon used was a firearm, only two bullets could be found in that small area." In fact, it may more reasonably be characterized as nonsensical that *any* cartridge casings were found if the weapon used was *not* a firearm. That Officer

12

Mueller did not discover any damage to vehicles or buildings in the area and that no one reported being a victim of this shooting does not undermine our conclusion.

Defendant asserts there was no evidence tying the two .380-caliber cartridge casings to a firearm. We disagree. Officer Mueller searched "the area where the shooting occurred," where he found the two cartridge casings.

Additionally, inasmuch as defendant's conduct may constitute circumstantial evidence to support a finding that he used a firearm (*People v. Monjaras*, *supra*, 164 Cal.App.4th at p. 1437), we note defendant hurriedly chased after the dark sedan, fired five shots at it from a significant distance in quick succession, and ran off. This conduct would seem to be more consistent with someone using a firearm than someone with a pellet gun or starter pistol as defendant implies may have been the case. In any event, at the least, we can say this conduct is consistent with use of a firearm, which further supports our conclusion.

We conclude substantial evidence supported the jury's determination that defendant possessed and discharged a "firearm." (§ 16520, subd. (a).)

III

*Lesser Included Offense*

Defendant asserts his conviction of discharging a firearm with gross negligence (§ 246.3, subd. (a)) must be reversed as a lesser included offense of shooting at an occupied vehicle (§ 246). The People concede the point, and we agree.

It "is generally permissible to convict a defendant of multiple charges arising from a single act or course of conduct." (*People v. Sanders* (2012) 55 Cal.4th 731, 736, italics omitted, citing § 954.) "However, a 'judicially created exception to this rule prohibits multiple convictions based on necessarily included offenses. [Citations.]' [Citation.] [¶] When a defendant is found guilty of both a greater and a necessarily lesser included offense arising out of the same act or course of conduct, and the evidence supports the

verdict on the greater offense, that conviction is controlling, and the conviction of the lesser offense must be reversed." (*Sanders*, at p. 736.)

In *People v. Ramirez* (2009) 45 Cal.4th 980, the California Supreme Court "conclude[d] that section 246.3[, subdivision ](a) is a necessarily included lesser offense of section 246. . . . All the elements of section 246.3[, subdivision ](a) are necessarily included in the more stringent requirements of section 246." (*Id*. at p. 990.)

We shall reverse defendant's conviction on count two as a lesser included offense.

IV

*Section 667, Subdivision (a) Enhancement*

The People assert the matter must be remanded for resentencing because the trial court failed to either impose a five-year term for the section 667, subdivision (a) prior serious felony enhancement or strike that enhancement. Defendant did not respond to this contention in his reply brief.

Before affording the parties the opportunity to be heard at sentencing, the trial court said it was "inclined to not use the [prior] strike conviction also for the five year [section 667, subdivision (a)] nickel prior. So I'm inclined to dismiss that nickel prior." When the trial court later imposed sentence, it did not mention the section 667, subdivision (a) enhancement.

"The failure to impose or strike an enhancement is a legally unauthorized sentence subject to correction for the first time on appeal." (*People v. Bradley* (1998) 64 Cal.App.4th 386, 391; accord, *In re Renfrow* (2008) 164 Cal.App.4th 1251, 1254.) It certainly may be that the trial court intended to sentence defendant in accordance with its tentative determination, and simply omitted stating that it was striking the section 667, subdivision (a) enhancement. However, because the enhancement must be imposed or stricken, we remand to the trial court for resentencing for this purpose.

DISPOSITION

Defendant's conviction for discharging a firearm with gross negligence (§ 246.3, subd. (a)) on count two is reversed and the sentence imposed on that count is vacated. The matter is remanded for resentencing for the trial court to exercise its discretion to strike the section 667, subdivision (a) enhancement or impose the five-year term on that enhancement. In all other respects, the judgment is affirmed. Upon resentencing, the clerk shall prepare an amended abstract of judgment and forward a certified copy to the Department of Corrections and Rehabilitation.

_____
HULL, Acting P. J.

We concur:

_____
RENNER, J.

_____
KEITHLEY, J.*

_____

* Judge of the Butte County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

15